UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ELIZA M. ROBERTSON,<br><br>           Plaintiff,<br><br>      v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social<br>Security,<br><br>           Defendant. | No. CV 09-08365-VBK<br><br>MEMORANDUM OPINION<br>AND ORDER<br><br>(Social Security Case) |

   This matter is before the Court for review of the decision by the Commissioner of Social Security denying Plaintiff's application for disability benefits. Pursuant to 28 U.S.C. §636(c), the parties have consented that the case may be handled by the Magistrate Judge. The action arises under 42 U.S.C. §405(g), which authorizes the Court to enter judgment upon the pleadings and transcript of the Administrative Record ("AR") before the Commissioner. The parties have filed the Joint Stipulation ("JS"), and the Commissioner has filed the certified AR.

   Plaintiff raises the following issues:

   1.   Whether the Administrative Law Judge ("ALJ") properly

        considered the medical evidence as contained in the treating opinion from Dabney Blankenship, Ph.D. (JS at 4);

2. Whether the ALJ properly considered the testimony of Plaintiff (JS at 17).

This Memorandum Opinion will constitute the Court's findings of fact and conclusions of law. After reviewing the matter, the Court concludes that for the reasons set forth, the decision of the Commissioner must be reversed.

**I**

**THIS MATTER MUST BE REMANDED FOR RECONSIDERATION OF**

**DR. BLANKENSHIP'S OPINIONS**

In Plaintiff's first issue, she questions whether the ALJ properly considered the medical evidence contained in the treating opinion from Dabney Blankenship, Ph.D. ("Dr. Blankenship"). Prior to addressing this question, the Court will briefly review Plaintiff's treatment record.

Plaintiff was first seen by Dr. Blankenship on December 19, 2005, following her filing of a workers' compensation claim related to work place harassment. (AR 191-210.) Dr. Blankenship performed a comprehensive examination, including a Mental Status Evaluation, along with eight other components which Dr. Blankenship described, generally, as objective tests. For example, Dr. Blankenship administered the Revised Hamilton Rating Scale for Depression ("RHRSD"), which he described as "one of the best known, most reliable, and most widely used tools for evaluating depressive symptoms. The scale has been used in the medical and psychiatric

communities and is appropriate for any medical or mental health setting where depressive symptoms must be assessed." (AR 200.) Dr. Blankenship diagnosed Plaintiff as suffering from major depression, severe, with psychotic features and post-traumatic stress disorder. (AR 207.) There are monthly treatment notes which post-date the initial treatment date in December 2005, and go through October 17, 2006. (AR 211-223.)

Following Dr. Blankenship's last treatment visit with Plaintiff in October 2006, he completed a 19-page Permanent and Stationary Report on the 31st of that month in connection with Plaintiff's workers' compensation case. (AR 248-267.) In that report, Dr. Blankenship diagnosed major depression, single episode, moderate. He indicated that psychotic features initially present appeared to be in remission, and also diagnosed post-traumatic stress disorder, residual and slowly resolving. (AR 260.) He assessed a current General Assessment of Functioning ("GAF") score of 58, reflecting a moderate level of difficulty with social, occupational, and school functioning. (AR 261.) Significantly, Dr. Blankenship completed a "Work Function Impairment Rating" (AR 263), prefacing this with definitions. (AR 262.) In these definitions, the term "slight" indicates a noticeable impairment, while "moderate" indicates a marked impairment. "Severe" is defined by Dr. Blankenship as inability to perform a work function. These definitions were provided within the context of Workers' Compensation terminology. Dr. Blankenship found slight impairment in Plaintiff's ability to maintain a work pace appropriate to a given workload; slight to moderate impairment in her ability to perform complex or varied tasks, and her ability to accept and carry out responsibility for directions; moderate limitations in her ability to

influence people and her ability to make generalizations, evaluations or decisions without immediate supervisors; and moderate to severe limitations in her ability to relate to others beyond giving and receiving instructions.

Following Dr. Blankenship's last treatment visit with Plaintiff in October 2006, he referred her to Dr. Musher, a psychiatrist, who performed an evaluation and wrote a report. (AR 269-278.) Dr. Musher assessed Plaintiff with an anxiety disorder, NOS, and major depressive disorder, recurrent. (AR 276.) Dr. Musher agreed with Dr. Blankenship's work function disability rating. (AR 276.)

There is an apparent gap in Plaintiff's treatment (which, unfortunately, was not resolved during the hearing before the ALJ on March 12, 2008 (AR 31-61), although Plaintiff testified), until February 19, 2008, when Plaintiff again visited Dr. Blankenship, who examined her, performed essentially the same psychological tests as were administered during her initial visit, and provided a current diagnosis of post-traumatic stress disorder and major depressive disorder, severe, with a history of psychotic symptoms. (AR 279.) Dr. Blankenship indicated that Plaintiff was having a marginal response to treatment (AR 270-81) and noted resurfacing symptoms. (Id.) He completed a Mental Residual Functional Capacity Questionnaire which contained "marked" and "extreme" limitations in areas of social interaction and adaptation. (AR 283.)[1]  In the same report, he indicated that Plaintiff would require 20- to 30-minute breaks every two hours if she attempted an eight-hour workday, and further

---

[1] Dr. Blankenship's definitions of these terms is set out at AR 282. The definitions he utilized in 2008 are consistent with Social Security terminology. See 20 C.F.R. §404.1520a(c)(4).

4

indicated that, at present, she would never have any "good" days. (Id.) On the same date, Dr. Blankenship conducted the aforementioned Psychological Reevaluation and Testing. (AR 295-309.) He essentially reaffirmed the same limitations he had found in December of 2006. (AR 308.)

It is noted that there are supplemental treatment notes from March 2008 through January 2009. (AR 311-324.) Dr. Blankenship completed a third questionnaire, entitled "Mental Work Restriction Questionnaire," which provided for mostly marked limitations in mental work activities, as of January 22, 2009. (AR 318-319.) He defined "marked" as a seriously limited ability to function in the work environment. (AR 320.) This information post-dated the ALJ's decision, but was submitted to the Appeals Council (AR 4-8), which gave it "little weight" because it was unsupported by Dr. Blankenship's treatment records, which the Appeals Council interpreted as documenting steady improvement in Plaintiff's mental condition. By September 23, 2008, the Appeals Council noted, Plaintiff "was doing well adjusting to her independent living status, was isolating less ... was calm and pleasant and her appearance was good; ... (AR 5-6.) The Court's review of these treatment notes indicates that they contain, in addition, substantial cautionary and less sanguine descriptions of Plaintiff's mental health recovery. These notes, in addition to the other mental health evidence, will receive careful scrutiny on remand.

The only other examining report of a mental status nature contained in the Administrative Record is a complete psychiatric CE performed on December 9, 2006 at the request of the Department of Social Services by Dr. Aguilar, a Board-eligible psychiatrist. (AR

224-227.)   This report reflects that only a brief mental status examination was performed, with no other testing of any kind.  Dr. Aguilar made a diagnosis on Axis I of post-traumatic stress disorder. (AR 226.)[2]

The Medical Expert, Dr. Peterson, testified at the hearing.[3]  Dr. Peterson had reviewed medical records, up to December of 2006. (AR 36.)  At the hearing, he was provided with Dr. Blankenship's February 19, 2008 report. (Id.)  In Dr. Peterson's opinion, there was an unexplained deterioration in Plaintiff's condition between Dr. Blankenship's 2006 report, and his 2008 report. (See AR at 37, 41, 42, 43, 46, 48.)  In Dr. Peterson's view, comparing Dr. Blankenship's 2006 and 2008 reports, "suddenly everything is markedly impaired --." (AR 37.)  Dr. Peterson indicated, sensibly, that he needed "a little help ... understanding ... between the beginning of '07 to now what, what happened?" (Id.)  At that point in the hearing, a break was taken from Dr. Peterson's testimony, and Plaintiff herself was examined.  Other than briefly testifying that she had no recollection that she told any of her treating doctors that she felt better, she was not asked anything which would tend to provide an answer to Dr. Peterson's question. (See AR at 37-38.)

Dr. Peterson indicated that Dr. Blankenship's remarks are not consistent with the remainder of the record, although he did not identify exactly what parts of the record are inconsistent.  Moreover,

---

[2]  At the hearing, Plaintiff testified that she recalled spending about five minutes in Dr. Aguilar's office "and she talked so fast that I hardly didn't understand what she was saying." (AR 40.)

[3]  While the face page of the transcript identifies the medical expert as "David Peterson, M.D. (AR 31), Dr. Peterson's curriculum vitae indicates that he is a licensed psychologist with a Ph.D. (AR 74-78.)

he stated that reviewing all of Dr. Blankenship's records, Plaintiff's functioning "varies over time ... within the Blankenship record ..." (AR 39.)

Dr. Peterson's principal complaint was that there was a lack of "objective testing" to support Dr. Blankenship's conclusions. (See, e.g., AR 41, 43-44.) In particular, Dr. Peterson testified that the various tests performed by Dr. Blankenship are simply "screens." (AR 43.)[4]

When Dr. Peterson was questioned by Plaintiff's attorney, he was asked whether or not Dr. Blankenship's initial assessment did not in fact contain "severe" findings [as to mental functioning]. (AR 49.) Dr. Peterson responded that "it wasn't all marked as it is here ..." (Id.)[5]

---

[4] The tests to which Dr. Peterson referred in his testimony are those set forth in Dr. Blankenship's report of December 19, 2005 (at AR 199, et seq. and in his February 19, 2008 report, at AR 300).

[5] Although Dr. Peterson did not specifically indicate what data of Dr. Blankenship's he was referencing, it might appear logical to conclude that Dr. Peterson was comparing Dr. Blankenship's October 31, 2006 Work Function Impairment Rating (AR 263) with Dr. Blankenship's Mental Residual Functional Capacity Questionnaire of February 19, 2008 (AR 279-283). While the Court would note (see infra for further discussion) that Dr. Blankenship typically recorded "slight" to "moderate" impairments in his October 31, 2006 evaluation, while in 2008, Dr. Blankenship noted mostly "marked" to "extreme" limitations, some of the difference may, as Plaintiff's counsel suggests, be due to definitional differences. For example, in 2006, Dr. Blankenship defined "moderate" as a "marked impairment" (AR 262), while in 2008, the term "marked" was defined as a serious limitation with substantial loss in the ability to effectively function. (AR 282.) Moreover, the scale of terms in 2006 went from slight to moderate to severe, without any provision for a notation of a marked limitation, while in 2008, the scale went from mild to moderate to marked to extreme. As the Court has noted, in 2006, Dr. Blankenship utilized workers' compensation terminology. In 2008, he utilized definitions applicable in Social Security evaluation. None of these definitional differences, however, were discussed or accounted for by
(continued...)

7

After the hearing, the ALJ, on April 28, 2008, wrote to Dr. Peterson, enclosing additional medical evidence, including Dr. Blankenship's February 19, 2008 reports (Dr. Peterson had seen some of this information at the hearing, as noted), and on May 30, 2008, Dr. Peterson responded to the ALJ. (AR 310.)  Dr. Peterson now made the following indication:

> "The new evidence provides clarity as to the duration of impairment reported in Dr. Blankenship's checklist dated 2/19/08. [Exhibit] 10 F/3. [See AR 295-309.]  Of the same date, notes 'resurfaced' symptoms, which may explain the sudden change in severity as noted in the checklist. However, we have no longitudinal data to support this level of severity ... Given the history of previously successful treatment and lack of contact with Dr. Blankenship from 10/31/06 to 2/19/08, combined medication and talk-therapy should improve functioning within the next six months."

(AR 310.)

Dr. Peterson's view of Dr. Blankenship's conclusions as to Plaintiff's mental functional abilities on February 19, 2008 was that "the levels of severity were a remarkable departure from the rest of the record.  Treating records were requested to find evidence to support this remarkable change." (Id.)

---

[5](...continued)
Dr. Peterson during his testimony at the hearing.  Rather, Dr. Peterson simply interpreted the 2008 findings by Dr. Blankenship as indicating an unexplained deterioration in Plaintiff's functioning which, according to Dr. Peterson, contradicted the balance of the medical records.  For reasons discussed infra, the Court disagrees.

**A.    Analysis.**

The ALJ's decision rejected Dr. Blankenship's conclusions in a somewhat perfunctory fashion: "No objective test results or diagnostic studies were used by Dr. Blankenship to establish the increase in symptoms that he noted [in February 2008]." (AR 23.)  The ALJ also cited the December 9, 2006 report of the psychiatric CE, Dr. Aguilar (AR 21), and Dr. Musher's December 5, 2006 report. (Id.)  Although stating, generally, that "great weight is given to the treating source opinions and to the opinion of the medical expert at the hearing" (AR 24), the ALJ made no specific findings as to the reports of Dr. Aguilar or Dr. Musher, and other than noting his conclusion (in agreement with the ME) that Dr. Blankenship's findings were not supported by any objective test results or diagnostic studies, the decision is unclear as to whether or not the ALJ gave any credibility whatsoever to Dr. Blankenship.  All of this makes it very difficult for the Court to accord any credibility to the ALJ's conclusions.  Certainly, on remand, there must be an objective analysis of Dr. Blankenship's conclusions with regard to Plaintiff's mental functional limitations, in particular, factoring in the different definitional standards which were used in his different reports.  It appears to the Court very likely that Dr. Blankenship's conclusions between 2006 and 2008 may not be significantly different; rather, any perceived difference may lie in the different definitional terms used.  Dr. Blankenship should be contacted to explain whether there is, in fact, such a discrepancy.  Moreover, the ALJ failed to address the findings of the psychiatrist, Dr. Musher, who examined Plaintiff in 2006, and who agreed with Dr. Blankenship's mental functional limitation conclusions.  It is also very critical that a determination be made as

9

to whether Dr. Blankenship did perform "objective" tests. While Dr. Peterson felt that this was not the case, the Court is unaware of any greater expertise of Dr. Peterson over and above that of Dr. Blankenship. Both are psychologists who have earned Ph.D.s. As the Court has noted in this Opinion, Dr. Blankenship asserted that several of the tests he performed are, in fact, of an objective nature. Further, many of the tests appear to have built-in validity components. If this amounts to nothing more than reliance upon subjective self-reporting, then much more needs to be explained to reach that conclusion.

The Court is, further, concerned with what would appear to be a double standard in terms of accepting or rejecting Plaintiff's subjective self-reporting in this case. That is, when Plaintiff may have reported that she was at times feeling better or doing better, in general terms, this was seemingly accepted by the ALJ, as it was by the ME. On the other hand, when Plaintiff stated that she was not doing well, this was rejected by the ALJ pursuant to a depreciated credibility finding. (See AR at 23.) These inconsistencies in evaluation are not reconciled in the ALJ's decision. Either Plaintiff is credible, or she is not credible.

Finally, in addition to further developing the record as the Court has indicated, on remand, the ALJ should take every opportunity to determine what, if any, treatment Plaintiff received during the apparent "gap" period of 2007.[6] If this apparent or possible lack of treatment is as significant as Dr. Peterson claims, an attempt should

---

[6] For example, Dr. Blankenship's treatment notes for 2008 (AR 311-317) make reference to apparent treatment by Dr. Musher, and the administration by him of medications. Did this begin in 2008? 2007? 2006?

1  be made to resolve this hanging question.

2  Because this matter will be remanded as to Issue No. 1, Issue No. 2, concerning the ALJ's rejection of Plaintiff's testimony, need not be extensively discussed, because Plaintiff's testimony, and her credibility, will be reevaluated <u>de novo</u> on remand.  The Court will note, however, that the reasons cited in the ALJ's decision are wholly insufficient.  At first, the ALJ makes the conclusory statement that, "The [Plaintiff's] hearing allegations were not credible or consistent with the credible medical evidence." (AR 23.)  This is a generalization which is routinely rejected by Courts, both at the trial and appellate levels. The Court need not cite basic concepts of credibility assessment to make this point.  Further, the ALJ apparently relied upon a conclusion that Plaintiff does not suffer adverse side effects to medications she has taken for her mental condition.  This does not constitute a basis for a credibility assessment.  Finally, the ALJ comments that Plaintiff continues to "enjoy" a normal level of activities of daily living, such as meal preparation, and maintaining personal hygiene, using public transportation, and interacting with family and friends and performing household chores. (<u>Id</u>.)  Even if, in fact, this is correct (which the Court has not evaluated), it would not appear to be a basis for a credibility assessment.  A person can brush her teeth and still have mental functional limitations.  A person can take a bus and still have such limitations.  The point is clear.  Plaintiff's credibility will be properly and correctly evaluated on remand.

For the foregoing reasons, this matter will be remanded for further hearing consistent with this Memorandum Opinion.

**IT IS SO ORDERED.**

DATED: September 2, 2010

          /s/
VICTOR B. KENTON
UNITED STATES MAGISTRATE JUDGE